Lett *v.* Emmett.

WILLIAM F. LETT, executor, appellant,

*v.*

ALICE P. EMMETT, respondent.

Where an executor sought by false representations and suggestions calculated and intended to excite apprehension in the mind of the residuary legatee, and by taking advantage of her poverty to induce such legatee to sell her interest in the estate to him for a small price, about one-fourth of its value—*Held*, that in so doing he was guilty of such an abuse of the trust and confidence reposed in him as justified his removal.

On appeal from order of Monmouth orphans court removing executor &c.

*Mr. William H. Vredenburgh, Mr. Cortlandt Parker* and *Mr. Adam C. Ellis* (of New York), for the executor.

*Mr. Chilion Robbins*, for Mrs. Emmett.

THE ORDINARY.

Mrs. Anne Duff Wallack, widow of James W. Wallack, died in Monmouth county, February, 1879. She was the owner of a farm of about forty acres at or near Elberon, a valuable lot on

NOTE.—In *Wiggin's Case, 29 Hun 271*, the fact that an insolvent trustee has made a settlement with certain of his *cestuis que trust*, whose portions he had converted to his own use, was held not to prevent the court from removing him, on the ground of misconduct, upon the application of another *cestui que trust*, although the latter's portion is in the hands of other trustees, and properly invested.

In *Marks* v. *Witkousi, 16 La. Ann. 341*, a trustee signed a petition to the court praying for the sale of his wards' lands, "believing the same to be for their interest." After the court had ordered the sale, and because his co-trustees refused to divide the commissions with him, he filed a protest against the sale, and appeared and opposed the sale, which was, on that account, adjourned.—*Held*, that his removal was justifiable.

In *Spaulding* v. *Wakefield, 53 Vt. 660*, it was held to be negligence for an executor to pay a legatee *more* than the amount of his legacy—that is, to de-

Lett v. Emmett.

the sea, and a building lot on Ocean avenue, in the same neigh-
borhood, and a house and lot of about three acres at Pleasure
Bay. She had also a small amount of personal property. By
her will, which is dated January 30th, 1873, she gave all her
estate to her husband for life (he predeceased her), and gave her
executors power to convert all her estate into money after his
decease, or with his consent, in his lifetime, and invest the pro-
ceeds; and directed them, after his death, to pay to her servant,
Nannie Taylor, an annuity of $500 for life; to Mrs. Florence
Sewell, $2,500; to Mrs. Eliza J. Mann, $1,000; to Mr. Edwin
Adams, $1,000; and to her servant, Dennis Murray, $500. The
residue of the income she gave to her mother, Caroline S. Blake,
for life, and directed her executors, on her mother's death, to pay
Mrs. Margaret C. Blake, widow of Dr. Lewis C. Blake, $2,500,
provided she should still be unmarried; to the American Dra-
matic Fund, $3,000; and to Sister Irene's Foundling Hospital,
$3,000. She directed that all the residue of her estate descend
and be distributed according to the laws of this state regulating
descents and distributions in case of intestacy, and she appointed
Richard E. Mount and William F. Lett, of New York city, and
Edwin Adams, executors, directing them to take $500 a year
from her estate for their services in lieu of all other compensa-
tion. Both Mr. Mount and Mr. Adams are dead. The will
was proved only by Mr. Lett. He proved it in March, 1879.
Of the legatees besides the testatrix's husband, her mother, Mrs.
Blake, is dead, and so also is Mrs. Mann. She appears to have

liver to him a $1,000 U. S. bond, worth in the market $1,200, in satisfaction
of his legacy of $1,000.

See further, as to sufficient grounds for removing a trustee, guardian &c.,
*Broughton* v. *Bradley, 34 Ala. 694; Crutchfield's Case, 3 Yerg. 335; Crain* v.
*Barnes, 1 Md. Ch. 151; Waller* v. *Armistead, 2 Leigh 11; Pike's Case, 45 Wis.
391; 2 Am. Prob. Rep. 336, note; Peacocke* v. *Leffler, 74 Ind. 327; Nickels* v.
*Philips, 18 Fla. 732; Faust* v. *Levy, 4 Lea 320; Livingston's Case, 34 N. Y.
554; Kellberg's Appeal, 86 Pa. St. 129; McFadgen* v. *Council, 81 N. C. 195.*

In *Thomson* v. *Eastwood, L. R. (2 App. Cas.) 215,* the court set aside an
agreement and release obtained by a trustee from his *cestui que trust* by his
representations as to the latter's illegitimacy, whereby he induced the *cestui
que trust* to assign his residuary share of the estate to him for a very inade-
quate consideration.—REP.

predeceased the testatrix.   It is said to be very doubtful whether the institutions called in the will the American Dramatic Fund and Sister Irene's Foundling Hospital now have any existence, or had any when the testatrix died.

In April, 1883, Mrs. Alice Placide Emmett, claiming to be next of kin and heir-at-law of the testatrix, and therefore entitled to the residue of her estate, filed her petition (subsequently amended) in the Monmouth orphans court against Mr. Lett, praying that he be removed from his office of executor, on the ground of gross mismanagement of the estate and waste and misapplication thereof, and that his conduct in his administration was prejudicial to her and all persons having claims against or interest in the estate.   The acts specified were the fraudulent attempt on his part to buy her interest from her for small and inconsiderable sums, although he knew it was worth a very large sum ; his failure to pay any of the legacies (except that he had paid $500 to Mrs. Sewell on account of her legacy), although he has and has had money enough of the estate justly applicable thereto in his hands to enable him to pay them ; his having sold a large part of the real estate at very low prices, when he could have got much larger ones ; and his omission to charge himself with a mortgage of $1,500 taken by him for part of the purchase-money of land of the estate sold by him.   The orphans court tried the matter, and by its order of March 31st, 1883, adjudged that the executor had misapplied the estate and abused the trust and confidence reposed in him, and thereupon revoked the letters testamentary issued to him, removed him from his office and appointed George W. Brown administrator *de bonis non cum testamento annexo* in his place, requiring Mr. Brown to give bond in the sum of $60,000, and ordering the executor to deliver over the goods, chattels, moneys and effects of the estate in his hands to the administrator, and to settle his account and pay over the balance to the administrator.   It also ordered that the costs of the proceedings, including the taking of the testimony, and a counsel fee of $700 to the counsel of Mrs. Emmett, the petitioner, be paid out of the estate.   From this order the executor appealed.

The statute provides that if it shall be made to appear before the orphans court, by proof, on complaint duly made by any person interested, that any executor, administrator, guardian or trustee has embezzled, wasted or misapplied any part of the estate committed to his custody, or has abused the trust and confidence.reposed in him, the orphans court may revoke the letters of such executor, administrator or guardian, and remove such executor, administrator, guardian or trustee from office.  *Rev. p. 780 § 126.*

I do not deem it necessary to discuss at any length all the various subjects of complaint against the executor which are presented by the petition and were debated on the hearing.  One of them, his abuse of his trust in attempting to buy the petitioner's interest in the estate in the way he did, seems to me to be of such importance and to be so clearly proved as to render it unnecessary to do more than merely advert to the others.  That he did not obtain the best price he could for the land he sold, there can be no doubt, for it is proved that Mr. Lewis B. Brown was anxious to have an opportunity to buy very considerable parts of the property sold (and so informed the executor), and would have given considerably more for those parts than the executor obtained ; but the executor, who promised to come to him before he sold the property, disregarded his wishes and sold without calling on him to ascertain whether he would purchase or not.  As to the $1,500 mortgage which the executor kept off record for over nine months from the time when it was received by him, and as to which his first account, which was filed in October, 1881, is silent, although he then held it and had done so for about nine months, it would seem that his omission to record it was a dereliction of duty on his part, especially when it is considered that from his pursuits and experience he may well be supposed to have known what was required of him in that respect.  The fact that he paid Mrs. Emmett $500 on account of her residuary interest in the estate, and left unpaid the larger part of Mrs. Sewell's legacy, would not of itself have warranted his removal.

To consider the attempt to buy the petitioner's interest :  Mrs.

Emmett was not aware of the fact that she had an interest under the will until nearly two years after the testatrix's death, and then it was made known to her by one James B. Dye, who was a stranger to her but not to the executor, and who called on her about the 1st of December, 1880, and offered her a small sum—$400—for it, which the executor advised her to take, saying, in substance, that in his judgment the estate was insolvent. She declined to do so, however, and employed a lawyer (Mr. John L. Logan) in New York to look after her interest. Mr. Lett offered to buy her interest of Mr. Logan at the price of $1,500 or $2,000. Mr. Logan says that the first time he spoke to Mr. Lett on the subject of Dye's offer to buy her interest, he asked Mr. Lett what the estate was worth, and the latter said he did not think it was worth anything ; that there were a good many debts and mortgages against it, and he should say that if Dye should give Mrs. Emmett $400 or $500, that was about all it was worth. He further says he thinks he told Mr. Lett that Mrs. Emmett would not sell at any such price ; that she would rather have nothing than to have only $400 or $500, and he says his impression is that that ended the matter for some time ; that some time afterwards Mr. Lett came to see him and they spoke of Mrs. Emmett's interest in the estate, and Mr. Lett said he thought it was worth about $1,500, and that he would give that sum for it. He does not fix the date of this conversation further than to say that it was some time prior to September 1st, 1881. That Mr. Lett was anxious to buy Mrs. Emmett's interest is manifest from his letter to Mr. Logan, dated August 10th, 1881, in which he says he understands Mrs. Blake (Mrs. Emmett's aunt) has left her some money (it was only $50 and came through his hands), and he thinks it will be advisable to "hurry things up," that his (Logan's) party (Mrs. Emmett) may change her mind when she hears the news. He says in his testimony that he knew Mrs. Emmett was poor ; that she had told him so herself. Mr. Logan further says that in December, 1881, or January, 1882, Mr. Lett told him that with careful management Mrs. Emmett's interest could be made to be worth $20,000. On the 22d of December, 1881, Mr. Lett paid Mr. Logan $500,

which the latter says was on account of the purchase-money of
Mrs. Emmett's interest, provided the sale to Lett should be
effected.    Mr. Lett says it was a payment on account of her in-
terest in the estate, and that he took a receipt accordingly.    But
his testimony on the subject was not given in such a way as to
inspire confidence, and the receipt (which states that the payment
was "to be credited to Mrs. Emmett's estate") was signed, not
by Mr. Logan, but by a clerk of his.    Mr. Logan testifies that
in the summer or early part of the fall of 1881, Mr. Lett said to
him that if there was really a desire to sell Mrs. Emmett's in-
terest, and they wanted him to buy it, he thought as long as she
had plenty of money she would not be as apt to sell as she
would if she did not have the money.    This evidently was
understood by Mr. Logan as a suggestion that he should discon-
tinue making advances to her as he had been doing, so that her
necessities might compel her to sell.    After the proceedings now
under review had been commenced, Mr. Lett called on Mr.
Logan (in July, 1882), and said that he thought the latter had
by his course in obstructing him, injured his client, and would
lose whatever money he, Logan, had advanced to her.    To
which Mr. Logan replied that he could not help that; that he,
Lett, had delayed matters; that he had refused to do anything,
and it seemed that unless some steps were taken the matter would
never be closed up.    And then Mr. Lett said he, Logan, would
probably be very sorry; that he, Lett, had some information
which might go to show that Mrs. Emmett was not entitled to
anything in the estate at all; and that he had something else
that was of much more importance than that; that there was a
large claim against the estate which would probably never be
heard of unless somebody stirred it up; and if those proceed-
ings were withdrawn and he was not interfered with any further,
he would wind up the estate at once—close it up—and then he
could convert it into cash and settle everything at once; and
that there were no debts, and that the probabilities were that
after Mrs. Emmett was paid, that creditor who held the large
claim could not get the money.    Mr. Logan testifies also that
Mr. Lett told him that if he would withdraw the proceedings

Lett v. Emmett.

he would pay Mrs. Sewell's legacy first. She, too, was Mr. Logan's client. It is but just to say, however, that Mr. Logan appears to have insisted that her legacy was entitled to priority in payment over the other legacies which are given after it in the will, because of the fact that it precedes them therein. It cannot be, and is not denied, that the executor sought to buy for himself the interest of the residuary legatee, and to that end was not only willing to take advantage of her necessities, but anxious to do so, and was even apprehensive that the receipt of a little legacy of $50 would, by furnishing her with a small sum of money for the supply of her pressing wants, prevent her from selling to him. That which, according to Mr. Logan's testimony, he said could with proper management be made to be worth $20,000, he sought to buy for $1,500 or $2,000. It is suggested in his behalf that in this matter he, at most, merely meditated, but was not, in fact, guilty of, an abuse of his trust, and that it would have been quite enough for the court to have required him to give security. But if his conduct was such as to induce the court, for that reason, to put him under bonds, it was such as to demand his removal. He was, however, in fact, guilty of an abuse of the trust and confidence reposed in him. His effort to buy the interest of Mrs. Emmett was, under the circumstances, a palpable breach of duty. It seems quite probable that Dye was his agent in the matter. He does not produce Dye as a witness, nor does he show that he is unable to do so. When Mrs. Emmett called on him, after Dye's visit to her, and she proposed to send her answer to Dye by letter to Dye's address, which she had, he suggested to her to leave her answer for Dye at his office; and to her question whether Dye would come there, he replied that he might very likely do so. Though he says that Mr. Logan offered to sell the interest to him, Mr. Logan's testimony is to the contrary—that the offer first came from Lett to buy. In consideration of this matter alone, and without regard to any of the other things which probably entered into the judgment of the court below, I am unwilling to reverse the order appealed from, so far as the removal of Mr. Lett and the appointment of an administrator in his stead are

Lett *v.* Emmett.

concerned. That part of the order which condemns the estate to the payment of the costs should, however, be reversed. If the executor, by reason of a misapplication of the funds of the estate and abuse of his trust, ought to be removed, he ought to bear the expense of the litigation which his misconduct has rendered necessary.

There will be an order that he pay the costs, both in the court below and here, together with $100 counsel fee to the respondent's counsel in this court. The direction for the payment of the counsel fees of Mrs. Emmett in the court below out of the estate will be affirmed.